## In re THOMAS.

### (District Court, N. D. New York. August 5, 1912.)

1. HUSBAND AND WIFE (§ 22*)—WIFE AS AGENT.

A wife whose husband conducted a livery and sale stable, and who during his temporary absence at different times acted for him, had no implied authority after he had absconded to sell his property, unless in the usual course of business.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 140, 141; Dec. Dig. § 22.*]

2. PRINCIPAL AND AGENT (§ 22*)—EVIDENCE OF AUTHORITY—DECLARATIONS OF AGENT.

The authority of an agent cannot be proved by his own declarations.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 40; Dec. Dig. § 22.*]

3. BANKRUPTCY (§ 145*)—RIGHTS OF TRUSTEE—CONVERSION OF PROPERTY.

After a debtor absconded a number of his creditors appointed a committee, who, in connection with his wife, who had no authority thereto, sold a large part of his property, paid certain lien claims, and retained the remainder of the proceeds for future disposition. It did not appear that the debtor ratified the sale, or knew of it until after his adjudication as a bankrupt. Held, that the action of the committee constituted a conversion, and the bankrupt's trustee had the right to follow the property, or sue the committee for its value.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 205, 230–232, 234; Dec. Dig. § 145.*]

4. BANKRUPTCY (§ 145*)—RIGHTS OF TRUSTEE—CONVERSION OF PROPERTY.

Such committee surrendered certain carriages to a carriage company from which the bankrupt purchased them, and which claimed the right to reclaim them, but such claim was not sustained by the evidence. Held, that the committee were accountable for the value of the carriages, but that the trustee was entitled only to such proportion of the value as would pay its share of the expense of administration and dividends to such creditors as did not join in the appointment of the committee, the others being bound by its action; also, that the committee was accountable to the same extent for a sum paid from the proceeds of the property to one claiming a chattel mortgage thereon, which was invalid as to creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 205, 230–232, 234; Dec. Dig. § 145.*]

5. BANKRUPTCY (§ 188*)—LIENS—CHATTEL MORTGAGE—RIGHT OF TRUSTEE TO AVOID—FAILURE TO COMPLY WITH RECORDING STATUTE.

Under Lien Law N. Y. (Consol. Laws 1909, c. 33) § 235, which provides that a chattel mortgage, although filed, shall be invalid "as against creditors of the mortgagor" after the expiration of the first or any succeeding term of one year, unless within 30 days preceding the expiration of any such term a statement is filed showing, inter alia, the interest of the mortgagee or his successor in the property, as construed by the Court of Appeals of the state, the failure to file a renewal statement complying with such requirement renders the mortgage invalid as against the general creditors of the mortgagor, and as against his trustee in bankruptcy, who for the purposes of the statute represents such creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–295; Dec. Dig. § 188.*]

**6. BANKRUPTCY (§ 188*)—VALIDITY—CONSIDERATION PAID BY OTHER THAN MORTGAGEE.**

The fact that a chattel mortgage made by a bankrupt, reciting that it was given to secure a loan from the mortgagee, was, in fact, made to secure a present loan from a bank to which it was assigned on the day it was made and recorded, or that the assignment was not recorded for some time afterward, *held* not to invalidate the mortgage, in the absence of any statute requiring the assignment to be filed, or any evidence that creditors of the mortgagor were misled to their prejudice.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–295; Dec. Dig. § 188.*]

**7. BANKRUPTCY (§ 188*)—TITLE OF TRUSTEE—LIENS.**

A trustee in bankruptcy does not take the estate subject to liens which are invalid as against general creditors, although they may be valid as to the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–295; Dec. Dig. § 188.*]

**8. BANKRUPTCY (§ 180*)—VOIDABLE TRANSFERS—MORTGAGE MADE TO HINDER AND DELAY CREDITORS.**

Under Bankr. Act July 1, 1898, c. 541, § 67e, 30 Stat. 564 (U. S. Comp. St. 1901, p. 3449), which makes void as against creditors transfers made by a bankrupt within four months prior to his bankruptcy "with the intent and purpose on his part to hinder, delay or defraud his creditors * * * except as to purchasers in good faith and for a present fair consideration," a mortgage given by a bankrupt within four months, when he knew himself to be insolvent and was preparing to abscond without paying his debts, to secure money previously advanced him by the mortgagee, a bank, was not given for a present consideration, and is void as against his trustee, although given pursuant to an oral agreement made before or at the time the money was advanced.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 252; Dec. Dig. § 180.*]

**BANKRUPTCY (§ 166*)—VOIDABLE PREFERENCE—REASONABLE CAUSE TO BELIEVE INSOLVENCY.**

Said mortgage also held voidable as a preference under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445) as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1911, p. 1506) the bank having had knowledge that nearly all of the property of the mortgagor, including that mortgaged, was previously heavily incumbered, and having refused him further credit except on receiving both such mortgage and a chattel mortgage.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

In the matter of John B. Thomas, bankrupt. Review of order and decision of referee directing and refusing to direct certain payments. Order modified.

Dunmore & Ferris, of Utica, N. Y., for Taber and others.
Martin & Jones, of Utica, N. Y., for the trustee.

RAY, District Judge. This review involves four distinct matters which for brevity may be spoken of as the Ames-Dean claim, Marshall mortgage claim, Addy mortgage claim, and Citizens' Trust Company mortgage. The Marshall and Addy claims involve chattel mortgages, and the other is a real estate mortgage.

## General Facts.

Prior to the month of March, 1910, the bankrupt, John B. Thomas, a married man, had conducted the business of running a livery and sales stable in the city of Utica, N. Y. During his temporary absences his wife had acted for him, presumably with his authority, but there is no proof that she had a general power of attorney or authority to act for him. If agent at all, her agency was special. It does not appear that Thomas ever objected to or repudiated any of her acts done in his absence.

At some time in February, or early in March, 1910, said Thomas left the city of Utica, and for some considerable time his whereabouts were unknown to his creditors and the general public. It does not appear that he has returned, and his evidence in the bankruptcy proceedings was taken at some place in Ohio. He left his wife and a considerable part of his property behind. Shortly before leaving Utica, Thomas purchased a car load of horses in Canada, and gave his check for the purchase price drawn on a bank in Utica, but same was not paid when presented; there being no funds to his credit. He took these horses with him to New York City, where he disposed of them, and then spent the money in ways which he has refused to disclose.

After the departure of Thomas from Utica and on his failure to return or disclose his whereabouts, it being known that he was heavily in debt, and some time in the latter part of March, 1910, quite a large number of his creditors, representing probably about 80 or 90 per cent. of same in amount, held a meeting and discussed the situation, and in writing appointed a committee, the purpose of which is shown thereby, in part at least. It reads as follows:

"The subscribers, creditors of John B. Thomas, of Utica, New York, hereby designate and appoint William I. Taber, Charles D. Thomas, Arthur W. McLaughlin, Patrick T. Fitzgerald, and Joseph T. White as a committee to represent and act for us, and for us with the assistance of Katharine R. Thomas, wife of said John B. Thomas, to take such course with reference to converting the assets of said John B. Thomas into cash, as in their judgment shall be for the best interests of all the creditors and to divide and distribute the proceeds among all the creditors of said Thomas ratably after payment of liens, upon the amount of their respective claims.

"Dated, Utica, N. Y., March 21st, 1910.
      "Creditors          Amount of Claim."

A large number of these appointments were signed, and I assume some were sent to and signed by various creditors who were not present at the meeting, and some are signed by one, some by two, and others by several of the creditors. However, they were duly signed. Something like 10 or 15 per cent. of the creditors never signed or assented thereto. This committee consented to act, and did act. William I. Taber, one of the number, acted as treasurer of such committee. Some one had prepared an inventory of the property belonging to Mr. Thomas. After the appointment of the committee, and I am taking these facts from the testimony of Mr. Taber, the members thereof, except Mr. White, went to the stables, conferred with creditors as to how the matter should be

handled, and considered the question of feeding and caring for the horses, and, in fact, purchased feed for them until sold. The committee had talks and conferences with Mrs. Thomas, the wife of the bankrupt, and she exhibited the books. This committee later made an auction sale of the property, and sold most of same. During the sale Mrs. Thomas billed out and receipted for the larger articles such as horses. Taber says:

"The committee acted in the course of disposing of property selling at private sale or auction sale as they could get best prices."

Thomas acted as auctioneer. This auction sale commenced March 24th, and continued about a week and until enjoined by the court. At the beginning of the sale, Mr. McLaughlin resigned from the committee. Mrs. Thomas was present, and assisted at the sale. The money received for the sale of certain of the property, something like $7,374.59, was deposited in bank by this committee subject to its order. There was other property sold by the committee to which special attention will be called, and the committee made certain disbursements as expenses, which expenses are not in question here. Something like $6,000 seems to have been turned over to the trustee in bankruptcy after his appointment. April 25, 1910, said John B. Thomas was duly adjudicated a bankrupt, and May 10, 1910, Abram G. Senior was duly appointed trustee of his estate, and he duly qualified May 12, 1910.

### Ames-Dean Claim.

May 3, 1909, said John B. Thomas by written order directed the shipment to himself of certain property, including four carriages. The property was shipped and delivered, and the four carriages were in the possession of Thomas at the time of the appointment of such committee, and came into their possession. They were then worth the sum of $255. The Ames-Dean Carriage Company claimed to own same under and by virtue of the terms of such order, and the committee delivered same to said "The Ames-Dean Carriage Company." The said order for such property, including said carriages, omitting the description of such property, reads as follows:

"The Ames-Dean Carriage Co., Jackson, Michigan:

"Please ship the following goods on or about *soon as ready* of the value as herein specified, and for which we agree to give our notes, on your usual forms, on receipt of invoice. Notes payable as per terms stated below. This order is not subject to countermand.

*       *       *       *       *       *       *       *       *       *

"Terms 5% 30 days or 4 months note. Will reship balance of car.

"Said vehicles to be made and furnished according to description in your illustrated catalogue, when not otherwise specified herein, warranted to be well made and of good material; any breakage from defect of material or workmanship to be replaced free of charge for one year when not otherwise specified.

"It is agreed that all goods at any time on hand manufactured by you, and the proceeds of sales of goods received under this contract, or prior and similar contracts, also future orders, whether in cash, notes, book accounts or other proceeds, are to be held in trust by me for you and subject to your

order until I have paid in full all my obligations due or to become due to you, whether for goods sold under this contract or under prior and similar contracts or future orders.

"The title to and ownership of all goods shipped under this contract, or prior and similar contracts, also future orders, shall remain vested in you until the prices thereof shall be paid and until I have paid in full for all goods shipped me, in cash or until all notes given under this contract, or under prior and similar contracts or future orders are paid and nothing in this contract shall be deemed as releasing me from my obligations to pay for said goods as per the notes hereby contemplated.

"No agreements, verbal or otherwise, are binding on you unless embodied in this order which is given subject to your acceptance.

"[Signed]   J. B. Thomas."

This was never filed as a chattel mortgage or conditional sale contract. It may be fairly inferred from the evidence that Thomas purchased buggies, etc., not only for use in his livery stable, but for sale. He says some were on hand not sold. The vehicles here in question had not been sold, and there is no evidence they had been used. Thomas testified he did not purchase them on consignment, had paid part of the debt in cash, and settled and paid the balance by giving his note; also that he purchased the carriages outright, on credit. The referee finds the committee liable to the trustee for the value of said carriages $255. The justice and correctness of this ruling is challenged.

### Marshall Mortgage Claim.

April 3, 1908, said John B. Thomas signed, acknowledged, and delivered to James Marshall a certain chattel mortgage covering certain horses and other personal property therein described. It recites that:

"I, John Thomas, of Utica, N. Y., being indebted to James Marshall of Utica, N. Y., for certain sums of money, which indebtedness is secured by a certain note or notes bearing date of April 1, 1908, payable to the said James Marshall and signed by me, now," etc.

This mortgage does not disclose the amount of the indebtedness. The note is not in evidence, nor is there any evidence or proof that there was a debt or note owing by Thomas to Marshall, when the money, the proceeds of certain of the property covered by the mortgage, was paid over to Marshall by the committee. In regard to this Taber testified as follows:

"Q. On page 6 of your record (Exhibit B) I note a statement of giving of check to Marshall April 6, 1910, for $927. Please state what occurred for the payment of $927 to J. Marshall. A. The Marshall mortgage covered several horses, sleigh, wagons, carriages, and harnesses about the place. As horses were sold, the money was turned over to Marshall, and, instead of covering separate list of these items, they were credited on regular sales slips and check drawn to him for $217 which made up the amount, the horses having sold for $390, $155, $165 which made $710, check for $217 given for the balance; the other articles having sold for more than that.

"Q. In what method did Marshall receive the $710? A. As I remember, Mrs. Thomas handled that in the same way as the other horse sales.

"Q. That is to say, that when those four horses, Honey, Dandy, Bony, and Manie, were sold and brought $710, Mrs. Thomas handed that $710 to J. Mar-

shall? A. They were billed out to Marshall in the regular way. I held that money until April 5th.

"Q. You received it, and April 5th handed it to Marshall? A. Yes.

"Q. So that besides $710 you also gave to Marshall $217, making total of $927? A. Yes.

"Q. (Witness shown paper, a certified copy of the J. Marshall mortgage.) That is on what you paid the $927 to Marshall? A. Yes. (Paper offered in evidence and received as Exhibit E of to-day. Also offered in evidence a certified copy of a purported renewal of said chattel mortgage to J. Marshall. Received as Exhibit F of to-day.)"

The chattel mortgage (Exhibit E) was duly filed in Oneida county clerk's office on the 3d day of April, 1908, at 4:55 p. m. On the 11th day of March, 1909, at 1:55 p. m., "a statement of renewal of chattel mortgage" dated that day and signed by James Marshall was filed in said clerk's office. This renewal reads as follows:

"I, James Marshall, of the city of Utica, state of New York, the mortgagee named in a certain chattel mortgage, bearing date the 3 day of April, 1908,

"Made and executed by John Thomas now residing in the city of Utica, state of New York, to James Marshall, and filed in the office of the clerk of Oneida county, state of New York, on the 3 day of April, 1908, at 4:55 o'clock p. m. for certain sums of money which indebtedness is secured by a certain note or notes bearing date of April 1, 1908, payable to the said James Marshall and signed by me upon certain property then being and situate in the city of Utica, state of New York, do hereby, pursuant to statute, certify and state that there remains unpaid of the amount secured by said mortgage, the sum of ———— dollars and ———— cents ($————), and interest thereon from the ———— day of ————, 19—, which sum is the amount of ———— interest in the property described in said mortgage claimed by ———— by virtue thereof.

\* \* \* \* \* \* \* \* \* \*

"Dated the 11 day of March, 1909.        James Marshall, Mortgagee."

Neither the amount to secure which the mortgage was given nor the amount then remaining due and unpaid or due or unpaid is stated in this renewal. It appears that Marshall was present at the sale made by the committee and assented to the sale. Taber took the money and kept it until April 5th, when $710, the proceeds of three horses, and a check of Taber's for $217 drawn on the fund, was given to Marshall. It may be assumed this is the amount he claimed. The referee finds and holds that the said committee should pay this sum, in all $927, to the trustee. This is challenged on this review.

### Addy Mortgage Claim.

On the 14th day of February, 1910, said John B. Thomas signed, acknowledged, and delivered to one Frank P. Addy a chattel mortgage on 21 horses, which mortgage was that day duly filed in the Oneida county clerk's office. It recited:

"Know ye, that I, John B. Thomas, of Utica, N. Y., am indebted unto Frank P. Addy in the sum of 5,200 dollars ($5,200), being for money advanced for a car load of horses, now for securing the payment of said debt, \* \* \* do sell, transfer and assign to the said Frank P. Addy all," etc.

Then follows a description of the property, power of sale, etc.

On the said 14th day of February, 1910, said Addy executed, acknowledged, and delivered to the Citizens' Trust Company of Uti-

ca, N. Y., an assignment of said chattel mortgage which was filed in Oneida county clerk's office March 24, 1910, at 2:25 p. m.

William I. Taber, one of said committee, and hereinbefore referred to, was and is the president of said Citizens' Trust Company. Further facts will be stated in connection with the real estate mortgage.

### Citizens' Trust Company Mortgage.

March 1, 1910, said John B. Thomas and Katharine R., his wife, executed, acknowledged, and delivered to the said Citizens' Trust Company a mortgage on his real estate, bearing date February 19, 1910, which recites a consideration of $1 and "other good and valuable consideration," and which, also, after describing the real estate mortgaged, contains the following:

"This grant is intended as and for collateral security for the payment of any and all sums of money which the said parties of the first part or either of them owes or which they or either of them may become hereafter indebted to the said party of the second part, and as and for collateral security for the payment of any and all indebtedness of said parties of the first part or either of them to the said party of the second part now existing or which may hereafter arise, and especially as and for collateral security for the payment of any and all notes signed or endorsed by the said parties of the first part or either of them and owned or discounted by the said party of the second part, and for the purpose of securing and indemnifying the said party of the second part of and from any and all loss, costs, charges, damages or expenses by reason of any indebtedness which now exists or which may hereafter exist in its favor against the parties of the first part or either of them."

The real property covered by the said real estate mortgage came to the possession of the trustee, and was sold by him, subject to all prior mortgages and liens, but free and clear of the lien of the above mortgage to said Citizens' Trust Company, for the sum of $250, which money he has subject to the lien of such mortgage, if any; the lien by stipulation being transferred to the fund. The referee finds that this sum should be paid to the said Trust Company. This is challenged on this review.

The property covered by said Addy chattel mortgage was sold by the said committee in the manner described for the sum of $2,-025, it is claimed. This money is in the hands of the said committee held as a special deposit because of the claim of the Utica Trust Company thereto. The referee finds that this sum should be paid over by the committee to Abram G. Senior, the trustee, but also finds that the trustee should at once pay same over to the Citizens' Trust Company of Utica, N. Y., on such mortgage. This is challenged on this review.

The referee makes no finding of fact whatever as to the real consideration for such Addy chattel mortgage and real estate mortgage, and when paid, except as recited in such instruments, leaving it to be inferred that both the Addy chattel mortgage and the real estate mortgage were for a present valuable consideration.

### Consideration.

The evidence shows that Thomas was never indebted to Addy; that Addy did not advance any money, but that the Citizens' Trust

Company did on an agreement that the advances should be secured by a real estate mortgage and a chattel mortgage or mortgages.

Said William I. Taber, the president of the said Citizens' Trust Company, testifies on this subject of these mortgages and the consideration therefor that on or about the 14th day of February (1910) he had a talk with J. B. Thomas relative to receiving the mortgages. He says:

"Think it was day before chattel mortgage that J. B. Thomas came with a note for $5,000, stating that he had an order from some New York parties to furnish them horses, and, in answer to questions that I raised to advance the money because of the fact that he had promised to sell his stables, he said this was an order of horses for buying and selling and making on the market, and, after a good deal of talking, we decided to furnish that money, but would require security, security not only in form of chattel mortgage, but real estate mortgage, and it was agreed that real estate mortgage should cover all his property subject to prior liens, and chattel mortgage should cover articles mentioned therein. Q. Did you thereupon take list of chattels and prepare papers? A. Yes. Q. Is Exhibit C and real mortgage those papers? A. Yes."

(Exhibit C is the chattel mortgage and Exhibit G is the real estate mortgage.) He then states that Mrs. Thomas signed the real estate mortgage. Mr. Taber's evidence then continues:

"Q. Did you as matter of fact before the day of the execution of those two mortgages advance any money to Thomas, and, if so, how much? A. It covered for checks and drafts prior to this.

"Q. Before they were executed? A. Yes.

"Q. How much money did you take care of in that way? A. $5,000.

"Q. How much money did you advance him from the 10th to 20th of February, prior to this talk? A. I can't recall exactly, it was several thousand.

"Q. Over $3,000? A. Yes; over $4,000.

"Q. Can you get it [the amount.]? A. Yes.

"Q. Between $4,000 and $5,000? A. Yes.

"Q. That money was advanced before securing of these chattel mortgage and real estate mortgage after this conversation and prior to making of the papers? A. Yes.

"Q. Thomas left Utica soon after the execution of the papers? A. Yes."

Later returning to the same subject, the following questions were asked by counsel for the Citizens' Trust Company and Mr. Taber, and the following answers given, viz.:

"Q. On or about the 14th of February you had a talk with J. B. Thomas, relative to real estate mortgage? A. Yes.

"Q. Between that day and the 20th of February you advanced him certain moneys? A. About the 10th of February that we made arrangements.

"Q. You had instructed our office to prepare those papers? A. I borrowed the searches and asked them to prepare the papers.

"Q. Mr. Garlock took the matter in hand? A. Yes.

"Q. Papers were signed on the 19th? A. The chattel mortgage on the 14th and real estate mortgage on the 19th."

He then testified as follows as to the financial transactions between the Citizens' Trust Company and Thomas between the 10th and 20th days of February, 1910:

"Q. Between the 10th of February after this talk and the 20th of February will you state how much new money the Citizens' Trust Company advanced

to J. B. Thomas between these two days. (Objected to by Mr. Martin as incompetent, immaterial. Objection sustained.)

"Q. Will you state how much the Citizens' Trust Company advanced to J. B. Thomas between the 10th and 20th day of February? A. Five thousand dollars given in form of checks for various amounts which will total even $5,000.

"Q. Pending the receipt of these papers did J. B. Thomas overdraw his account? A. Yes.

"Q. Give them. A. The 14th $159.65, $10, $99.50, $31.41, $500, $210, $7.50, $25.13. $50.75, $465, $2,460, $50, on the 16th.

"Q. Go ahead and state what was the total amount of his check you carried for him each day from the 10th to the 20th. A. February 10th $370.35, 11th $808.56, 16th $3,268.38, 17th $749.26, 18th $133.05 and $88.07, 19th $515.

"Q. On the 16th you credited item of $5,000 to his account? A. I did.

"Q. That was the proceeds of the note which the chattel mortgage and real estate mortgage was given to secure? A. Yes.

"Q. Subsequently all of that $5,000 which was credited to his account was paid out? A. Yes.

"Q. At the time of the credit of the $5,000 note on the 16th, what was the amount of checks you had paid for him which there was no credit in the bank? A. Four thousand eight hundred nineteen dollars and forty-two cents.

"Q. So after credit of $5,000 note it made a balance to his credit upon which he could check of $180.58? A. Yes."

### Cross-examined by Mr. Martin.

"Q. On the tenth day of Feb. 1910, you had a conversation with J. B. Thomas about further accommodation? A. That is as I recall it.

"Q. He had been a customer of the bank? A. Yes.

"Q. He was there to see about further accommodation? A. Yes.

"Q. What did you tell him would be required as you recall it? A. I think I have testified as to that. We should require chattel mortgage and real estate mortgage as security.

"Q. Real estate mortgage subject to prior mortgages? A. Yes.

"Q. Chattel mortgage on such property as not covered by other chattel mortgages? A. Yes.

"Q. You knew some of his property was covered by chattel mortgage? A. Yes.

"Q. That day by paying checks the bank let him have $370? A. There were deposits along during those days, but we paid some checks that day amounting to $370.75.

"Q. Are you able to state how much the checks you paid that day exceeded the balance to his credit? A. They did not exceed that day. The first day that the account was overdrawn was on the 14th.

"Q. What were the total of the checks paid out for him on the 14th? A. Three thousand two hundred sixty-eight dollars and thirty-eight cents and the 11th was the first overdraft.

"Q. Can you state how much was overdrawn on the 11th? A. Sixty-two dollars and two cents.

"Q. Then there were no more checks paid until the 14th? A. Yes.

"Q. Can you state how much was overdrawn on the 14th? A. Two thousand nine hundred forty-seven dollars and forty-five cents.

"Q. On February 15th the checks paid out were $2,887.58, and overdrew how much? A. Four thousand five hundred thirty-five dollars and eight cents.

"Q. On the 16th? A. Checks $749.26, overdraft left balance of $224.76, 17th check of $133.05 left balance of $91.71.

"Q. On the 16th J. B. Thomas account was credited on the ledger with the amount of the $5,000 note? A. Yes.

"Q. That note bears date the day previous? A. Some days previous.

"Q. These checks that were paid and made up this overdraft were miscellaneous checks that he attempted to draw on his account? A. What do you mean?

"Q. Checks to the order of different people? A. Yes."

It is evident from the testimony of Mr. Taber that on the 10th day of February, 1910, Thomas wanted more credit with the Trust Company; that the Trust Company agreed to extend it on having security by way of real estate and chattel mortgage which Thomas agreed to give; that neither party waited for. the preparation and execution of the papers, but Thomas commenced drawing checks which overdrew his account and these were paid by the Trust Company. On the 10th Thomas drew on his account, but did not overdraw, $370.35. On the 11th he overdrew $62.02. On the 14th he overdrew $2,947.45. On the 14th the chattel mortgage was given to Addy, and the same day assigned to the Citizens' Trust Company. On the 16th the note of $5,000 was given by Thomas, and it was credited to his account. On that day, prior to this credit, his account was overdrawn $4,819.42. It is evident that the giving of the chattel mortgage to Addy and his assignment thereof to the Citizens' Trust Company was a mode of securing the overdrafts which at that time seem to have amounted to $2,947.45, for Mr. Taber says:

"Q. On the 16th you credited item of $5,000 to his account? A. I did.

"Q. That was the proceeds of the note which the chattel mortgage and real estate mortgage was given to secure? A. Yes.

"Q. Subsequently all of that $5,000 which was credited to his account was paid out? A. Yes."

February 19, 1910, Thomas drew from the Trust Company $515, and on that day the real estate mortgage is dated, but it was not executed or recorded until March 1, 1910, or some 10 days later. Therefore this mortgage was given March 1, 1910, to secure a past indebtedness, but pursuant to an agreement to give it, and on the faith of which agreement the credit was extended.

From the evidence of Thomas we would conclude that notes were given from time to time up to the 16th, when the $5,000 note was made, and that on that day the old notes were surrendered and the large note given in their place as well as for an additional sum. This evidence was read into the record, and the Trust Company did not dispute it except in the way stated.

[1] 1. There is no evidence before the court to justify a finding that Mrs. Thomas was the agent of John B. Thomas with any power to sell or dispose of his property in the mode it was sold and disposed of, or to authorize such disposition. If she had any apparent authority, it was simply to let horses and carriages, collect pay for the use, and sell goods in the usual course of business, and collect and pay accounts in the usual course of business. This was the full extent of her apparent authority so far as anything she had ever done or been permitted to do is concerned. And as said in 31 Cyc. 1218:

"It will not be inferred from the fact that third persons thought the agency existed, nor because the alleged agent assumed to act as such, nor because the conditions and circumstances were such, as to make such an agency seem natural and probable, and to the advantage of the supposed principal. Finally, an implied agency must be based upon facts, and facts for which the principal is responsible, and upon a natural and reasonable and not a strained construction of those facts. And if, in view of the facts, an implied agency is apparent, its extent is limited to acts of a like kind with those

from which it is implied, and is to be restricted to the purpose for which the facts show that it was granted."

Therefore the acquiescence of Mrs. Thomas and the assistance rendered by her in the sales made afford no protection to this committee. "An estoppel cannot be invoked in favor of one who has relied upon the alleged agent's declaration of his authority, and made no further inquiry." Buskirk v. Talcott, 96 N. Y. Supp. 714; Morris v. Joyce, 63 N. J. Eq. 549, 53 Atl. 139; 31 Cyc. 1244; Quay v. Presidio, 82 Cal. 1, 22 Pac. 925. Hence what she said to them is immaterial.

[2] 2. Power or authority in Mrs. Thomas to consent to such sales or authorize them could not be proved by her declaration or statements to the committee. It is settled that agency cannot be established by the proof of the declarations of the alleged agent, even if made in connection with the doing of the acts in question. See authorities cited.

[3] 3. The title to all this property, the horses, carriages, etc., was in John B. Thomas at the time the committee acted and sold and disposed of same, and remained in him down to the time of the adjudication in bankruptcy. Even the filing of a petition in bankruptcy does not divert the title of the bankrupt. Johnson et al. v. Collier, 222 U. S. 538, 32 Sup. Ct. 104, 56 L. Ed. 306, decided January 9, 1912. Title to the proceeds of the sales made vested in the said John B. Thomas and remained in him down to the time of the adjudication subject to his right, on being advised of the truth as to what had been done, all the facts, to repudiate the transactions, and sue the members of the committee. The acts of the committee constituted a conversion of his property. There is no evidence that Thomas ever ratified the transactions, or that he was informed thereof prior to the adjudication in bankruptcy. Therefore the trustee, when duly qualified, had the right to repudiate and follow the property, or sue the committee for the value waiving the tort.

### Ames-Dean Claim.

[4] If, therefore, the three carriages passed over to the Ames-Dean Carriage Company by this committee actually belonged to John B. Thomas, were his property, the members of the committee who acted in the matter are liable for the value thereof to the trustee in bankruptcy. As a chattel mortgage the order referred to and recited was void as to the trustee because not filed. Skilton v. Coddington, 185 N. Y. 80, 77 N. E. 790, 113 Am. St. Rep. 885. But was it void as between the Ames-Dean Company and Thomas, so that such company had no right to take possession?

Assuming that Thomas himself is in error in testifying that he purchased all the carriages outright and paid for same by giving his note which was accepted, and assuming that this order covered the transaction, but that a settlement was made as to all of the property described therein, a large number of articles and carriages besides the three in question, there was only a balance of account, and, if that account was settled and the Carriage Company took a note for such balance (and all this is not disputed), then the Ames-Dean Car-

riage Company only had a lien good as against Thomas at best, but not as against his creditors, as the order in the nature of a chattel mortgage had not been filed as required by law. Skilton v. Coddington, 185 N. Y. 80, 77 N. E. 790, 113 Am. St. Rep. 885. There is no proof that the note or debt was due. If the situation was such that the Carriage Company had the right to demand of and take from Thomas the possession of these carriages, it had the same right as against the committee, otherwise not. It is contended that this committee did not take possession of this property, but I think the evidence of Mr. Taber, who was very fair and candid in his testimony, together with the authorization signed by the creditors, or about 90 per cent. of them, shows that they did. I think this referee was right in finding that this committee should account for the value of these carriages. However, this does not mean that they must necessarily pay over the whole value thereof to the trustee, unless they elect so to do, and then receive back the part they are not in fact and equity liable for. This committee had authority from (it is stated, I have not sufficient facts in this record to base the statement on) about 90 per cent. of the creditors in amount, and some 38 in number, to do what they did, and all of such creditors are bound by their acts. It would be most unfair and unjust to have the value of these carriages paid to the trustee and distributed to all the creditors. That fund is, of course, subject to its share of the expenses of administration, including commissions and to be counted in figuring the distributive shares of creditors so as to ascertain the just shares therein of nonassenting creditors, but so much and so much only can be retained by the trustee, and such proportions and such only need be paid over to the trustee as will pay its part of the expenses, commissions, and distributive shares of nonassenting creditors.

### Marshall Mortgage Claim.

[5] I do not see that this committee had any justification whatever for paying over this $927 to Marshall. As to creditors, his chattel mortgage was and is "invalid," for the reason that the statute of the state of New York as to refiling or filing a statement had not been complied with. True, the transaction took place shortly prior to the filing of the petition in bankruptcy. However, the owner of this property, later adjudicated a bankrupt, and actually a bankrupt at the time, had left, whereabouts unknown, and these creditors, not all, assumed to sell, through this committee, all his property, and apply it to the payment of his debts. True, they were volunteers, but acting without authority, and they were wrongdoers as to nonassenting creditors and Thomas himself. It is immaterial that Mrs. Thomas, the wife, joined in and assented and aided. And it is immaterial that Marshall himself took part in and assented to this mode of disposing of the property. If his chattel mortgage was invalid as to creditors, he had no right to the property, and as mortgagee he could confer none. And it is immaterial that this transaction took place shortly before the filing of the petition in bankruptcy, and that the creditors had no judgments or executions re-

turned unsatisfied. Their rights were the same as though they had obtained judgments, etc., but their remedy was to obtain judgment, execution, etc. The bankruptcy proceedings interfered with this, interposed, and thereupon the trustee had the right in the interest of all these nonassenting creditors to recover the property or its value. Skilton v. Coddington, 185 N. Y. 80, 77 N. E. 790, 113 Am. St. Rep. 885. This case followed by the Supreme Court of the United States and now by the Circuit Court of Appeals in this circuit, and which overrules the dicta in Re N. Y. Economical Printing Co., 49 C. C. A. 133, 110 Fed. 514, is in line with Stephens v. Perrinc, 143 N. Y. 476, 39 N. E. 11, and Karst v. Gane, 136 N. Y. 316, 323, 32 N. E. 1073, and holds that a chattel mortgage not filed as required by statute is void as to general creditors who became such prior to actual filing, and that the trustee in bankruptcy can, in behalf of all creditors, avail himself of such nonfiling notwithstanding the fact that such creditors had not obtained judgments and execution returned unsatisfied, such preliminaries being a matter of procedure merely, and not going to the right. Prior to bankruptcy, general creditors with judgment and execution can seize the mortgaged property from the mortgagee, even if the mortgagee has taken possession, but not from a bona fide purchaser from such mortgagee, but, after bankruptcy, the trustee may seize the property in the hands of the mortgagor or mortgagee, or recover its proceeds from such mortgagee who took possession before bankruptcy. See Stephens v. Perrinc, supra; Skilton v. Coddington, supra; Russell v. St. Mart., 180 N. Y. 355, 73 N. E. 31; Karst v. Gane, 136 N. Y. 316, 323, 32 N. E. 1073. If, therefore, Marshall was not entitled to the property mortgaged for the reason his renewal statement was insufficient, he was not entitled to the proceeds of such property, and, if he was not entitled to the property or its proceeds, this committee which made the sale had no right or authority to pay such proceeds, or the proceeds of other property of Thomas to Marshall in satisfaction of his alleged lien. As against general creditors, Marshall had no lien on the property. These gentlemen composing this committee had no legal right to sell any of the property of Thomas and apply the proceeds to the payment of the debt due and owing to Marshall from Thomas, if any. Article 10 of the Lien Law of the state of New York, relating to chattel mortgages (3 Consolidated Laws of the State of New York, pp. 2170, 2173), in section 230, provides that a chattel mortgage, if not accompanied by an immediate delivery and continued change of possession of the mortgaged chattels, "is absolutely void as against the creditors of the mortgagor," unless the mortgage or a true copy is filed as prescribed in subsequent sections, and by section 235 it is provided:

"Mortgage invalid after one year, unless statement filed. A chattel mortgage, except as otherwise provided in this article, shall be invalid as against creditors of the mortgagor, and against subsequent purchasers or mortgagees in good faith, after the expiration of the first or any succeeding term of one year; reckoning from the time of the first filing, unless, (1) within thirty days next preceding the expiration of each such term, a statement containing a description of such mortgage, the names of the parties, the time when and place where filed, the interest of the mortgagee or any person who has suc-

ceeded to his interest in the property claimed by virtue thereof, or (2) a copy of such mortgage and its indorsements, together with a statement attached thereto or indorsed thereon, showing the interest of the mortgagee or of any person who has succeeded to his interest in the mortgage, is filed in the proper office," etc.

There was no effort to comply with this provision of the statute so far as stating the interest of the mortgagee in the property was concerned, although there were blank spaces to be filled. As no sum was inserted as unpaid, we might assume nothing was unpaid but for the mere fact that the paper was filed as a "Statement Renewal Chattel Mortgage" (Exhibit F), from which we would infer a purpose to renew, and we would also infer a want of purpose to renew a paid chattel mortgage. In any event, it is not a substantial compliance with the statute, and hence the mortgage from April 3, 1909 (it having been filed April 3, 1908), was "invalid" as against all creditors of John B. Thomas, and was invalid when the committee sold the property and turned over the proceeds to Marshall, and the trustee in bankruptcy can follow the proceeds in the hands of Marshall, or hold the parties who took the possession of the property from Thomas and converted it into money, and paid the proceeds over to Marshall even with his assent and concurrence. As against creditors, now represented by this trustee, the mortgage was "invalid." It matters not that this committee was acting in good faith. They acted without authority from Thomas and certain of his creditors, and as to them their acts were wrongful. It is, of course, true, as stated with reference to the proceeds of the carriages, that the assenting creditors cannot share in the recovery. If their committee, their agents, paid something they should not have paid or applied money derived from the sale to the payment of illegal claims, that is a matter between the committee and such assenting creditors for whom they acted.

It is contended by counsel for the committee that the word "invalid" in the statute does not have the effect to make the mortgage absolutely void as to the trustee and these nonassenting creditors. But the word is used in its ordinary sense and meaning, which is:

"Not valid; of no force, weight or cogency, weak. * * * In law, having no validity or binding force; wanting efficacy; null; void, as an invalid contract or agreement." Century Dictionary.

There is nothing in the context of this statute to limit or modify the meaning of the word. The statement required as to the interest of the mortgagee in the property was and is an essential statement, and its omission made the statement of renewal ineffective to preserve the lien of the mortgage. Marsden v. Cornell, 62 N. Y. 215, 218, 219; Fish v. Humphrey, 1 Denio (N. Y.) 163; Ely v. Carnley, 19 N. Y. 496. This court is without power to repeal a plain statutory provision of the state of New York. Really we come to the proposition whether or not a number, but not all, of the creditors of an absconding insolvent debtor can get together and appoint an agent to take possession of, sell, or dispose of the property of such debtor, and after paying liens thereon, if any, dis-

tribute the proceeds amongst the general creditors, and whether or not such agent can escape liability and accountability to the trustee in bankruptcy when appointed in proceedings duly instituted for his errors, mistakes, and for payments from the insolvent's estate on alleged ;but in fact invalid liens; whether or not in such a case the trustee is relegated to an action for the dissipation and misapplication of the absconding debtor's property, made in his absence and without his authority, against the party or parties receiving the property or its proceeds? The question is an important one in the administration of the affairs of insolvent debtors. If this can be done, then a minority of the creditors of an insolvent absconding debtor can appoint a committee to act as court, marshal, referee, and trustee, and from its acts, however mistaken and contrary to law, there will be no appeal, and for wrongs done not willful there will be no remedy except for the trustee when duly appointed and authorized by a duly constituted court to follow the property and the recipients thereof into possibly far distant states (here, in one case, Ohio), and there contest title in the state courts. The time may come when such tribunals will act as a sort of appellate court to right the alleged wrongs done by the courts, but they should not, at present, be recognized as courts of first instance. I have no doubt that these creditors and this committee appointed by them acted in the utmost good faith and purposed to conserve the estate and save expense. However, they acted at their peril, and are answerable to the law. There is a duly organized constitutional court known as the court in bankruptcy, authorized by an act of the Congress of the United States, and which has full and plenary power in such cases as this was, and there is a course of procedure, the best Congress was able to agree upon, which ought to be followed. I am of the opinion that those who do not follow it are answerable to the courts and its duly constituted and chosen officers for any loss the estate of the insolvent sustains by reason of their unauthorized acts. It can be, and is, argued that, if Thomas had returned, he could not have recovered the proceeds of the property mortgaged to Marshall and paid over to him by this committee (as he was present and in point of fact and in effect took possession) from Marshall or the members of this committee, inasmuch as the mortgage was valid, whether properly refiled or not, as between Thomas and Marshall, and that the rights of the trustee in bankruptcy are no greater than those of Thomas would have been had he returned. This line of reasoning ignores the fact that the trustee represents the creditors and their rights and interests, and that the unauthorized acts of this committee placed this property and its proceeds out of the possession of the bankrupt, and where it was impossible for the trustee to take actual possession as he otherwise could have done. In 1 Loveland on Bankruptcy, 958, § 474, it is said.

"It may be observed that a trustee is expressly authorized to avoid a mortgage, as a preference, which is valid as between the bankrupt and the mortgagee, or one given within the four months' period to hinder, delay, or defraud creditors, which could not be set aside by the bankrupt, or one which

for want of record or other reason is not valid as a lien as against the claims of creditors, although it is valid as between the mortgagor and mortgagee. In these cases the trustee is vested with the rights of creditors in addition to the title of the bankrupt."

It is, of course, unnecessary to say, but, to avoid confusion, may be proper to state, that many cases may be found both in the decisions of the Circuit Courts of Appeal and the Supreme Court of the United States where unfiled and not properly refiled chattel mortgages have been held valid as against creditors and the trustee in bankruptcy. Whether valid or invalid as against creditors and the trustee depends on the statute of the particular state where the transaction arose. In New York (Skilton v. Coddington, supra) they are invalid; in Kentucky valid as to creditors, unless their claims are reduced to judgments prior to bankruptcy. Holt, Trustee in Bankruptcy, v. Crucible Steel Co. of America, decided by the Supreme Court of the United States April 1, 1912, 224 U. S. 262, 32 Sup. Ct. 414, 56 L. Ed. 756, and where the whole subject is considered and the cases are referred to. See, also, York Mfg. Co. v. Cassell, 201 U. S. 344, 352, 26 Sup. Ct. 481, 50 L. Ed. 782. It follows that this committee must account for and pay over so much of the value of this property—that is, so much of the $927— as may be required to pay to the nonassenting creditors their proportional share thereof, and also so much as may be required to pay its proportional part of the expenses of administration and commissions. The trustee cannot take advantage of the situation for the benefit of the assenting creditors.

## Addy Chattel Mortgage Claim.

[6] The parties handled this matter gingerly in giving the evidence regarding it. Who Addy was does not appear. There is no proof that he personally advanced any money or took or held any note, except as we refer to the recitation in the mortgage. On the other hand, Taber says this chattel mortgage was given to secure the advances made and to be made by the Trust Company and some of which were made on the 14th day of February. This mortgage was at once assigned to the Citizens' Trust Company, but the assignment was not recorded until March 24, 1910, some 40 days subsequent to the giving and filing of the mortgage. If the testimony of Mr. Taber, the president of the Citizens' Trust Company, is true that Thomas agreed to give this mortgage to secure money to be furnished by the said Trust Company, and that the Trust Company did furnish it, and that this mortgage was given to secure that money so furnished, then it was not given to secure any note given to Addy for money advanced by Addy to pay for a car load of horses, and the mortgage itself was misleading and would operate to deceive and mislead creditors of Thomas who, by this circumlocution, would be kept in ignorance of the fact that Thomas had no credit with the Trust Company and no account there of any amount except as created by a loan secured by this chattel mortgage on his livery stock of horses, and of which

fact the creditors were kept in ignorance. As to creditors, it would leave them to suppose that, while Thomas owed Addy for money advanced to pay for a car load of horses, he had a large account with the Trust Company, and was doing a fair business to say the least. If the real transaction was that the Trust Company furnished the money on an oral agreement that payment should be secured by a chattel mortgage, and this mortgage was given in fulfillment of that agreement, and Addy was to take it for the benefit of the Trust Company and assign it to such company and did, and this was a legal and proper way to give a chattel mortgage to the Citizens' Trust Company to secure the payment of such debt, then the Citizens' Trust Company was the real mortgagee, and the mortgage and the assignment of same, both together, constituted the mortgage to the Citizens' Trust Company. If the object or purpose of filing a chattel mortgage is to give notice and information to creditors and subsequent lienors that the mortgagor owes the real mortgagee a certain sum of money the payment of which is secured by a lien on the mortgagor's goods and chattels so that inquiry can be made of the mortgagee from time to time as to the actual amount of the indebtedness, then this transaction failed to comply with the spirit and true intent of the statute relating to the filing of chattel mortgages as a material part of the chattel mortgage contract was not filed until March 24, 1910, three days after the committee was appointed and had taken possession of the property. The statute requires a chattel mortgage and the whole of it to be filed, but there is no statute in New York requiring the filing of the assignment of a chattel mortgage. Inquiry could have been made of Addy and then of his assignee as to the amount due on the mortgage. On the trial no inquiry was made of Mr. Taber as to the connection of Addy with the transaction, or the reason why the mortgage was given to him. He may have been an officer of the Trust Company. The true consideration was open to full inquiry, and it seems to me that this court should not assume or infer from this evidence that the connection of Addy with the transaction was anything but legal and proper. It may be that in some way the Trust Company loaned the money through him, and that he became responsible therefor as surety or indorser. The transaction, as shown by the proof, creates some suspicion, but does not establish fraud as matter of fact, and I know of no rule that makes such a transaction fraudulent or invalid as a matter of law. I do not approve of such a mode of doing business, and possibly it ought to be discountenanced and made invalid by legislative enactment, but that is not a matter for this court to decide. In Hincks v. Field, 60 Hun, 576, 14 N. Y. Supp. 247, affirmed 129 N. Y. 633, 29 N. E. 1030, it was held that a debt owing by one person may be secured by a mortgage given by another on his individual property, and that the creditors of such person giving the mortgage cannot complain; that is, it is not necessary that the consideration for a mortgage move from the mortgagee to the mortgagor. In Chafey v. Mathews, 104 Mich. 103,

62 N. W. 141, 27 L. R. A. 558, a mortgage securing an indebtedness due to the bank ran to the cashier of the bank in his individual name only, but other creditors of the mortgagor knew the purpose of the mortgage, and were not prejudiced by the form of the transaction. In Russell v. Longmoor, 29 Neb. 209, 45 N. W. 624, the actual ownership of the money advanced as the consideration for the giving of the mortgage was held to be immaterial. In Craft v. Barndow, 61 App. Div. 247, 70 N. Y. Supp. 364, the name "James B. Stead" was inserted as mortgagee in place of "Sylvester B. Sage." Stead made no claim. The court held that no reformation of the instrument was necessary, and that the mortgage was good and valid as between the mortgagor and the person whose name should have been inserted as mortgagee; he having received and filed it.

These cases do not really cover the proposition here. However, there is no evidence that other creditors of Thomas were misled or prejudiced. In the absence of some decision to the contrary, and I am not pointed to any, I will hold that as the Trust Company concededly advanced or paid the consideration for this mortgage, some $2,947.45 of it, on the day the mortgage was actually executed and delivered to Addy and filed and assigned by Addy to the Citizens' Trust Company, that it was a valid instrument as between Thomas and said Trust Company, and created a valid lien on the property described therein to that extent, viz., $2,947.45, as against Thomas and his creditors and the trustee in bankruptcy. There is no evidence that the property mortgaged was worth more than that sum, and hence the decision of the referee that the Citizens' Trust Company is entitled to such sum of $2,025 from the trustee when received by him was correct, and is affirmed. Of course, the committee having it in possession or custody must pay same to trustee in bankruptcy as he is entitled thereto as against such committee.

## Citizens' Trust Company Mortgage.

As we have seen, there was an agreement to give a real estate mortgage made on the 10th day of February, 1910, to secure the payment of money to be advanced by the Trust Company to Thomas. Thomas was thereupon allowed to overdraw his account, and on the 16th his note for $5,000 was given and accepted, and the amount thereof credited to his account, and he proceeded to draw the balance of the money and all of it prior to March 1, 1910. On the 1st day of March, 1910, Thomas and his wife executed and delivered the mortgage. There was no new indebtedness or indebtedness arising on that day, and no present consideration for the mortgage. This was within four months of the filing of the petition in bankruptcy against Thomas and the adjudication which follows. It was the giving of a security for the payment of a pre-existing debt pursuant to an oral agreement to give it and on the faith of which agreement this money was advanced or loaned several days before the security was exacted or actually given. No

indebtedness arose at the time of or subsequent to the giving of such mortgage, and nothing was parted with at that time. An agreement to give security followed at a subsequent time, date, by giving it pursuant to such agreement, is not the giving or execution of such security on the day or at the time the agreement is made. The actual giving of such security at such subsequent date does not relate back to the date or day of the agreement, even if the consideration is paid at the date of such agreement or intermediate the agreement and the execution and delivery of the mortgage.

[7, 8] "The rule that the trustee takes the estate of the bankrupt in the same plight as the bankrupt held it is not applicable to liens which, although valid as to the bankrupt, are invalid as to creditors." First National Bank of Baltimore v. Staake, 202 U. S. 141, 149, 26 Sup. Ct. 580, 50 L. Ed. 967. In short, the trustee does not take the estate subject to liens which are invalid as to creditors. This court has already asserted this in Re Cramond (D. C.) 145 Fed. 966, 971. Section 67d of the Bankruptcy Act provides as follows:

"Liens given or accepted in good faith and not in contemplation of or in fraud upon this act and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall, to the extent of such present consideration only, not be affected by this act."

Section 67e provides as follows:

"That all conveyances, transfers, assignments, or incumbrances of his property, or any part thereof, made or given by a person adjudged a bankrupt under the provisions of this act subsequent to the passage of this act and within four months prior to the filing of the petition, with the intent and purpose on his part to hinder, delay, or defraud his creditors, or any of them, shall be null and void as against the creditors of such debtor, except as to purchasers in good faith and for a present fair consideration; and all property of the debtor conveyed, transferred, assigned, or encumbered as aforesaid shall, if he be adjudged a bankrupt, and the same is not exempt from execution and liability for debts by the law of his domicile, be and remain a part of the assets and estate of the bankrupt and shall pass to his said trustee, whose duty it shall be to recover and reclaim the same by legal proceedings or otherwise for the benefit of the creditors."

Section 1 of said act, "Definitions," provides (25):

"Transfer shall include the sale and every other and different mode of disposing of or parting with property, or the possession of property, absolutely or conditionally, as a payment, pledge, mortgage, gift or security."

This mortgage to the Citizens' Trust Company was a "transfer" made by the (now) bankrupt "within four months prior to filing the petition" and if made by Thomas with intent and purpose on the part of Thomas, "his part," to hinder, delay, or defraud his creditors, or any of them, was and is null and void. If given with such intent and purpose on the part of Thomas, it is immaterial what the intent and purpose of the Citizens' Trust Company was; for, unless it paid or gave a "present fair consideration," the mortgage is void. Good faith alone on the part of the Trust Company

does not protect the Trust Company. The consideration must have been a "present" one. The words "to the extent of such present consideration only" have been inserted in section 67d since this proceeding was instituted, and those words do not affect the rights of these parties. The subsequent part of section 67e makes transfers of property void if invalid by the laws of the state where the transaction took place, but this has nothing to do with the real question presented here. If Thomas made this real estate mortgage with intent and purpose to hinder, delay, or defraud his creditors, or any of them, it is null and void, unless the Trust Company took it in good faith and for a "present" fair consideration.

It cannot be doubted from the evidence that Thomas intended and purposed to hinder, delay, and defraud his other unsecured creditors. (1) He was hopelessly in debt and insolvent and knew it. (2) He had even then run in debt for a car load of horses which he took to New York and disposed of, and used the proceeds in ways which he refused to disclose on the ground it would incriminate him to answer. He drew and delivered a check in payment which was never paid as he had no funds. He had exhausted in other ways all the money advanced and credited by the Citizens' Trust Company. On the 14th of February, he gave the chattel mortgage on his livery stock which with other valid mortgages was for a sum greater than its value, and he almost immediately used all the proceeds not used up before. He had no credit with the Trust Company where he did his business. His real estate was then incumbered to an amount within $250 of its full value. Taking all the evidence and his own admissions, it is plain that he had determined to abscond and leave his creditors unpaid except as secured days before he gave this mortgage. The only effect and the natural and known effect of giving these mortgages, and this real estate mortgage on the 1st day of March, 1910, was to hinder, delay, and defraud his other creditors. It could have no other effect. Thomas, under the circumstances disclosed, is presumed to have intended the natural, inevitable, and known consequences of his own acts, which were to hinder, delay, and defraud his other, or unsecured creditors. He was insolvent, and very soon adjudicated a bankrupt. If this section of the Bankruptcy Act has any validity and is to be given effect in any case, it should be given effect in this, where all the facts are undisputed and show conclusively that there was no "present" consideration for the mortgage, and that it was given by the mortgagor, within a short time adjudicated a bankrupt, when insolvent and with the intent and purpose on his part to hinder, delay, and defraud his other creditors, or some of them.

To bring this case within section 67e above quoted, it is, of course, necessary that the evidence establish a fraudulent intent and purpose on the part of Thomas, something more than the mere giving of a preference which will avoid the transfer if at the time of the transfer the person making it was insolvent, and the transfer would then operate as a preference and the person receiving it

then had reasonable cause to believe that the enforcement of such transfer, mortgage, would effect a preference; that is, enable the Citizens' Trust Company to obtain a greater percentage of its debt than any other of the creditors of Thomas of the same class. Sections 60a and 60b as amended. Coder v. Arts, 213 U. S. 223, 242, 243, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008. Here the fraudulent intent on the part of Thomas is a question of fact, to be determined on the whole evidence. The mere fact that one creditor is preferred over another or others, or that the transfer might have the effect to secure one creditor and deprive others of the means of obtaining payment is not sufficient. Coder v. Arts, supra; Stewart v. Dunham, 115 U. S. 61, 5 Sup. Ct. 1163, 29 L. Ed. 329; Huntley v. Kingman, 152 U. S. 527, 14 Sup. Ct. 688, 38 L. Ed. 540. There is no actual fraud in merely securing one creditor and not others if there be an honest purpose to pay all, but here we have decisive proof that Thomas was getting all the money and property he could into his hands with the intent and purpose to abscond, use same for his own purposes, not pay his other creditors at any time. His acts involved actual wrong, a bad intent, and moral turpitude. It must be remembered, also, that since Coder v. Arts, supra, was decided, section 67d has been amended so that liens "given and accepted in good faith, and not in contemplation of or in fraud upon this act, and for a present consideration, which have been recorded according to law if record thereof was necessary in order to impart notice," are not affected by the Bankruptcy Act "to the extent of such present consideration only." The last quoted words were inserted by the amendments of June 25, 1910, after the institution of this bankruptcy proceeding so the insertion of the words of the amendment does not affect this case.

[9] Is this real estate mortgage voidable by the trustee as a preference? Clearly so, I think. So far as Thomas is concerned, he knew that he was hopelessly insolvent. The facts proved and within his knowledge show this. He had lost credit and obtained it with the Trust Company only by mortgaging all he had. The Trust Company is charged with notice that all his real estate was covered by mortgages to nearly its full value, and it insisted on a mortgage on substantially all his personal property not already covered by mortgage. He had offered his property and business for sale, and the president of the Trust Company knew this. Other chattel mortgages were on file, and Thomas drew the main part of the $5,000 loaned after February 10, 1910, by overdrafts and before the chattel mortgage and note were actually given. and all of it prior to March 1st. It is inconceivable that Mr. Taber did not have reasonable cause to believe March 1, 1910, and before, not only that Thomas was actually insolvent, but that he intended to give a preference, and it is perfectly plain that the Trust Company intended to get a lien in preference to all other creditors of Thomas. It was put on inquiry, and under the circumstances of this case is charged with knowledge of all it might have learned by inquiry. The statement of Mr. Taber shows he was put on

inquiry and declined to extend credit without the security promised. The transactions between February 10th, and March 1st, inclusive, cannot be regarded as one continuing transaction, so as to make, in the eye of the law, the money put to the credit of Thomas February 16th, the little that was put to his credit, a present consideration of March 1, 1910. If transactions are to be upheld on mere oral agreements to give mortgages, which are not given until a subsequent date, on the ground that they are for a present consideration, the door is wide open for the grossest frauds, and the words of the statute, "for a present fair consideration," are judicially legislated out of same. In re Great Western Mfg. Co., 152 Fed. 123, 127, 81 C. C. A. 341; In re Dismal Swamp Contracting Co. (D. C.) 135 Fed. 415, 417; In re Ronk (D. C.) 111 Fed. 154; Pollock v. Jones, 124 Fed. 163, 61 C. C. A. 555; In re Sheridan (D. C.) 98 Fed. 406; Wilson v. Nelson, 183 U. S. 191, 22 Sup. Ct. 74, 46 L. Ed. 147.

In Re Ronk, supra, Judge Baker said:

"It cannot be successfully maintained that the verbal agreement created a valid lien as against the claims of the creditors; and if it did not create a valid lien, then, by the terms of the Bankruptcy Act, it cannot be enforced as a lien entitled to priority over other claims. It created no lien—nothing but a secret equity, possibly good as between mother and son, but certainly not valid and enforceable to the prejudice of the claims of creditors. The Bankruptcy Act embraces payments for the purpose of giving preferences, as well as the giving of securities for such purposes; and it would hardly be contended that a preference by way of payment, otherwise invalid, would be valid because the debtor had agreed at the time it was contracted to pay the debt without defalcation on a specified day. The doctrine contended for by the mortgagee would necessarily invite and inevitably lead to the defeat of the Bankruptcy Act. It would be easy, in every case where it was desired to thwart the operation of the law and to give a preference to a relative or a friend, to make an agreement at the time the money was loaned or the credit given for a mortgage to be executed in the future. If the law can be thus evaded, it would be an open invitation to every person loaning money or giving credit to the bankrupt to enter into such a verbal agreement with him. Such agreements, if held valid, would create secret liens upon the bankrupt's property, and would enable him in every case to effect the very objects which it was the purpose of the bankruptcy act to prevent. Such agreements would undoubtedly be made, in every case where the debtor wished to secure relatives and friends, to the detriment of his other creditors. It would be a standing invitation to perjury, and would defeat the declared policy and purpose of the bankruptcy act."

This is quoted with approval in Re Dismal Swamp Contracting Co. (D. C.) 135 Fed. 417. The same proposition is held in Tilt v. Citizens' Trust Co. (D. C.) 191 Fed. 441, 449, and Judge Cross quotes with approval from In re Great Western Mfg. Co., 152 Fed. 123, 127, 81 C. C. A. 341, 345. In this case of Tilt v. Citizens' Trust Co. the familiar rule to which I have referred is also declared:

"A creditor of a bankrupt who took security within four months prior to the bankruptcy with notice of facts which would incite a man of ordinary prudence to inquiry as to the solvency of the debtor is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed."

### General.

That the acts of the committee in intermeddling with the property of Thomas after he had absconded, and when they knew he

was insolvent, constituted a wrong and injury to his property, and that the right to recover therefor passed to the trustee on his qualification does not seem to demand the citation of authorities, but it may be well to do so.

When a person who has no right to meddle with the goods of another takes them and removes them from one place to another, he is guilty of a trespass; but, if he exercises dominion or control over them for the benefit of himself or of some other person or persons, he is guilty of a conversion. Addison on Torts (4th Eng. Ed.) American notes, 393, 394. And all such rights of action for injury to property or property rights pass to the trustee in bankruptcy. 1 Loveland on Bankruptcy (4th Ed.) § 403; In re Gay, 182 Fed. 260, 25 Am. Bankr. Rep. 111; Hansen Co. v. Wyman, etc., 105 Minn. 491, 117 N. W. 926, 21 L. R. A. 727; Williams v. Heard, 140 U. S. 529, 11 Sup. Ct. 885, 35 L. Ed. 550. But a right of action for personal injuries does not. Sibley v. Nason, 196 Mass. 125, 81 N. E. 887, 12 L. R. A. (N. S.) 1173, 124 Am. St. Rep. 520, 12 Ann. Cas. 938. Says Loveland (volume 1, section 403):

"A right of action ex delicto for the recovery of damages arising from the unlawful taking or detention of, or injury to, the bankrupt's property, is expressly vested in the trustee. Whether the right of action to recover damages for a tort passes to the trustee in bankruptcy of the injured party depends upon whether the tort is a property tort or a personal tort. If injury resulted to the property of the bankrupt before bankruptcy, the right of action to recover damages passes to the trustee. Thus, claims for an unlawful seizure of property by a foreign government, claims against the United States by a citizen, or a resident alien, pass to the trustee. The trustee, and not the bankrupt, is the proper party to institute a suit to recover for improvement made on government lands, or for money obtained by deceit and fraud, or against a sheriff for not collecting the contents of an execution, or a suit for the infringement of a patent, or copyright, or trade-mark, or for malicious attachment of property."

And in section 402 the author says:

"The Bankrupt Act transfers and vests in the trustee all rights of action arising upon contracts, or for the unlawful taking or detention of, or injury to, the bankrupt's property."

The result is that so much of the order of the referee as is under review and which directs the payment of the $2,025 to the trustee and by him to the Citizens' Trust Company is affirmed; so much of said order as directs the payment by the trustee to the Citizens' Trust Company of the sum of $250 proceeds of the real estate is reversed; and so much of said order as directs said William I. Taber, P. T. Fitzgerald, J. T. White, and Charles D. Thomas to pay to said trustee the said sum of $925, the value or proceeds of certain property, paid over to said Marshall and the sum of $255, the value of the four carriages delivered to the Ames-Dean Carriage Company, is so far modified as to require them to pay over to such trustee so much of such sums as will be necessary to pay the proportional parts thereof applicable to the payment of costs and expenses of administration, including commissions of referee and trustee, and the distributive shares therein of the nonassenting creditors on the basis that such sums of $925 and $255 belong to

the estate for all purposes, but not such parts of said sums as would go to the assenting creditors as dividends in distribution. Such order will also provide that all creditors who signed the said appointment of such committee are not to share in such sum of $925 and $255.

There will be an order accordingly.